UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| BROCKE ROBINSON,<br><br>   Plaintiff,<br><br>v.<br><br>MRH CORP. d/b/a NORTHERN LIGHT MAYO HOSPITAL AND EASTERN MAINE HEALTHCARE SYSTEMS d/b/a NORTHERN LIGHT HEALTH<br><br>   Defendants. | Civil Action No. |

COMPLAINT
JURY TRIAL REQUESTED
INJUNCTIVE RELIEF SOUGHT

JURISDICTION AND PARTIES

1. This action arises under the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551, *et seq.*, the Whistleblowers' Protection Act ("WPA"), 26 M.R.S. §§ 833, *et seq.*, and the False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq.*

2. Mr. Robinson is a United States citizen residing in the Town of Corinth, County of Penobscot, State of Maine.

3. MRH Corp. ("MRH") is a Maine non-profit corporation with a principal place of business in the Town of Dover Foxcroft, County of Piscataquis, State of Maine.

4. Eastern Maine Healthcare Systems ("Northern Light") is a Maine non-profit corporation with a principal place of business in the City of Brewer, County of Penobscot, State of Maine.

5. MRH is an "employer" as that term is defined in the MHRA, WPA, and FCA.

6. Northern Light is an "employer" as that term is defined in the MHRA, WPA, and FCA.

7. Mr. Robinson filed a timely Charge/Complaint of Discrimination with the Maine Human Rights Commission ("MHRC").

8. On April 23, 2021, Mr. Robinson received a "right to sue" letter from the MHRC.

9. Mr. Robinson has exhausted all administrative remedies for purposes of the claims set forth in this Complaint.

10. This Court has subject matter jurisdiction over Mr. Robinson's federal and state claims pursuant to 28 U.S.C. §§ 1331 and 1367.

## JURY TRIAL REQUESTED

11. Pursuant to Maine Rule of Civil Procedure 38, Mr. Robinson hereby demands a jury trial on all issues triable of right by jury.

## FACTUAL ALLEGATIONS

12. Mr. Robinson was a former employee of Meridian Mobile Health d/b/a Capital Ambulance ("Meridian"), which was an affiliate of the Eastern Maine Healthcare System.

13. In 2016, Mr. Robinson was physically and verbally assaulted by his paramedic team lead.

14. Mr. Robinson reported the assault to Steve Smith, his shift supervisor. Smith took no action to investigate or correct the team lead's unsafe and illegal conduct.

15. Mr. Robinson reported the assault to Human Resources and was told to meet with Joe Kellner, the head of Meridian.

16. After meeting with Mr. Kellner, Mr. Smith, and the paramedic team lead, Meridian took no corrective action and told Mr. Robinson that he would have to continue working on a truck with his paramedic team lead in spite of the assault.

17. Unable to work in such unsafe conditions, Mr. Robinson resigned.

18. Mr. Robinson told Mr. Smith and Mr. Kellner that he was resigning because they did not take effective action in response to his report of assault and that he was going to file a complaint with the Maine Human Rights Commission ("MHRC").

19. Mr. Robinson submitted an Intake Questionnaire to the MHRC alleging whistleblower retaliation against Meridian.

20. Before Mr. Robinson signed and notarized a MHRC complaint, the VP of Human Resources for EMHS, Paul Bolin, contacted him and offered him a severance package if he agreed not to pursue his complaint with the MHRC.

21. Mr. Robinson resolved his dispute with Meridian and EMHS through voluntary settlement executed on November 15, 2016.

22. In October 2018, Mr. Robinson was hired to work as a Paramedic/Emergency Medical Technician at Mayo Regional Hospital ("MRH").

23. Mr. Robinson performed his job duties satisfactorily.

24. While employed by MRH, Mr. Robinson reported that MRH was engaging in illegal conduct.

25. Defendant submitted bills to Medicare as well as to private insurance companies.

26. Mr. Robinson reported that MRH was submitting false claims to Medicaid/Medicare.

27. A medical necessity form needs to be completed when a patient is transferred by ambulance out of the hospital.

28. Medicare will pay for the ambulance if the patient's condition is such that use of any other method of transportation is contraindicated. In any case in which some means of transportation other than an ambulance could be used without endangering the individual's health,

whether or not such other transportation is actually available, no payment may be made for ambulance services.

29. One factor considered by Centers for Medicare & Medicaid Services ("CMS") when evaluating medical necessity is documentation that a patient in question is "bed-confined" which means that the patient is unable to get up from bed without assistance, unable to ambulate, and unable to sit in a chair or wheelchair.

30. MRH instructed Mr. Robinson and other EMTs to intentionally omit details from medical necessity forms which evidenced that a patient in question was not bed-confined and/or was able to utilize an alternative form of transportation. This was done so that it would be easier for Mayo to certify transports as medically necessary and therefore billable to Medicare.

31. By billing CMS for transports as medically necessary when the information did not support the CMS preconditions for payment, Mayo engaged in fraud against the government, failed to comply with the requirements set out in the CMS regulations and engaged in violations of the FCA.

32. On multiple occasions, Mr. Robinson reported his concerns about the fraud to Brian Mullis, Director of Emergency Medical Services at MRH and opposed the fraud. Mr. Mullis told him to just do his job and don't ask questions.

33. Mr. Robinson's reports constituted protected activity for purposes of the WPA and FCA.

34. Mr. Robinson had a reasonable cause to believe that these billing practices violated CMS regulations and constituted fraud.

35. In or around February 2020, Mr. Robinson reported this fraud to CMS.

36. Mr. Robinson's report constituted protected activity for purposes of the WPA and FCA.

37. On information and belief, MRH was made aware of Mr. Robinson's report to CMS.

38. Mr. Robinson also reported to MRH that it was running expired municipal plates on ambulances.

39. MRH is not a municipality but its ambulances had municipal plates because the ambulance service was formerly managed by a municipality.

40. The license plates expired in February 2020.

41. Mr. Robinson reported concerns about this illegal condition to Supervisor Keith Cookson in February 2020. Cookson said he would look into it.

42. Mr. Robinson's reports regarding the license plates was protected activity for purposes of the WPA.

43. When the license plates were not renewed, Mr. Robinson reported this illegal conduct to Jason Oko at Maine EMS and Melissa Adams, a licensing agent for Maine EMS, in about mid-February 2020.  Mr. Oko said they would look into it.

44. The license plates were not renewed.

45. Upon information and belief, a Mayo Ambulance with expired license plates was involved in an accident in Bangor on Broadway and Center while running code 3.

46. Mr. Robinson also reported that MRH was providing EMS classes taught by an uncertified and unqualified instructor.

47. Mr. Mullis taught EMS classes.

48. Mr. Robinson learned that Mr. Mullis was not certified to teach EMS classes.

49. As a result, students who took EMS classes were not qualified to be certified.

50. Mr. Robinson reported concerns about Mr. Mullis teaching EMS classes without certification to Jason Oko at Maine EMS in about mid-February 2020. Oko said they would look into it.

51. Mr. Robinson's report about Mr. Mullis lack of certification and qualification was a protected report for purposes of the WPA.

52. On February 1, 2020, Mr. Robinson resigned his full time EMT position with MRH because of concerns about the above-referenced illegal actions by MRH.

53. Mr. Robinson's employment status changed to part time/per diem.

54. Mayo Regional Hospital merged with a new corporation entitled MRH Corp., effective March 1, 2020.

55. MRH Corp. was created by EMHS as a new corporate entity for the Hospital.

56. On March 3, 2020, Mr. Robinson was notified that he was terminated.

57. On March 27, 2020, Respondents' lawyer stated: "Per 26 M.R.S. § 630, Mr. Robinson was not terminated.  His employment ended when his employer, the former Mayo Regional Hospital, ceased to exist."

58. This is not correct.  Mr. Robinson remained employed as of the March 1, 2020 merger of the old and new corporations.

59. In addition, upon information and belief, MRH employees like Mr. Robinson were not required to complete an application and rather were allowed to continue working for the new corporate entity in their same positions.

60. In response to a follow-up question asking why Mr. Robinson was not permitted to continue employment like the majority of other employees, Defendant's attorney added the following: "Mr. Robinson's employment with Mayo Regional Hospital ended when that entity ceased to exist.  Mr. Robinson was not hired by the new entity, Northern Light Mayo Hospital because he previously executed a severance agreement with Meridian Mobile Health, an EMHS

member organization, in 2016 in which in exchange for severance pay, he agreed he would not be employed by any EMHS member organization in the future."

61. Defendants admit that prior to making the decision to terminate Mr. Robinson, Northern Light, by and through Paul Bolin, engaged in a review of Mr. Robinson's performance by consulting with Mayo management.

62. On information and belief, managers at MRH that were aware of Mr. Robinson's protected activity at MRH provided false and misleading information about Mr. Robinson's tenure and performance.

63. On information and belief, the subordinate bias of managers at MRH proximately caused Mr. Robinson's termination.

64. The stated reason for Mr. Robinson's termination is an admission that he was terminated in connection with his prior complaint of whistleblower retaliation against Meridian.

65. Mr. Robinson's prior complaint of whistleblower retaliation against Meridian was a but for cause of his termination, in violation of 5 M.R.S. §4633(1).

66. Defendants claimed to the MHRC that Mr. Robinson "agreed he would not be employed by any EMHS member organization in the future" which is not the case.

67. Defendants terminated Mr. Robinson's employment and/or refused to continue to employ him because of his protected whistleblower activity against Meridian, in violation of the WPA, the MHRA, and the FCA.

68. In their August 17, 2020 Submission to the MHRC, Defendants allege that the decision not to permit Mr. Robinson to remain employed by MRH was made by Mr. Bolin, Northern Light's Vice President and Chief Human Resources Officer.

69. For this reason, EMHS is liable for the unlawful termination.

70. Defendants indicate that MRH Vice President of Human Resource James Godley communicated the decision to Mr. Robinson.

71. Mr. Bolin acted as an agent and representative of MRH when he made the decision to terminate Mr. Robinson.

72. As set out above, the subordinate bias of MRH managers proximately caused the termination and for this reason and those set out above, MRH is liable for the unlawful termination.

73. Mr. Robinson engaged in conduct in furtherance of an action under the FCA and action that reasonable could lead to a viable FCA action.

74. Northern Light, by and through Mr. Bolin, discriminated against Mr. Robinson because he opposed an act or practice that is unlawful under the MHRA and because he contacted the MHRC with regard to violations of the MHRA experience at Meridian, submitted an intake questionnaire setting out these violations, and otherwise participated in the MHRC process for investigating these violations.

75. Northern Light, by and through Mr. Bolin, coerced, intimidated, and interfered with Mr. Robinson's exercise and enjoyment of his rights under the MHRA and because he exercised and enjoyed these rights.

76. In addition, a fact finder could and likely would conclude that the explanation given by Defendants is not accurate and is evidence of pretext.

77. Upon information and belief, other employees who have settled employment claims against entities owned and acquired by EMHS have been permitted to remain employed after their current employers are incorporated in EMHS' system.

78. Defendants treated Mr. Robinson differently and worse than similarly situated coworkers and terminated Mr. Robinson's employment and/or refused to continue to employ him because of his protected whistleblower activity while employed at MRH, in violation of the WPA, MHRA, and FCA.

79. Mr. Robinson retained counsel in this matter in April 2020.

80. On April 30, 2020 counsel sent a letter to Northern Light's attorney advising Northern Light that this firm was representing him and requesting that Northern Light and its affiliates preserve paper and electronic documents that may be relevant to claims because Mr. Robinson's "employment and termination/failure to hire will likely be the subject of future litigation".

81. The letter was sent by certified mail with return receipt and the return receipt was signed by Northern Light at 9:45 AM on Monday, May 4, 2020.

82. Therefore, on May 4, 2020, Defendants through counsel had notice that Mr. Robinson was pursuing these claims against them.

83. Following Mr. Robinson's separation from MRH, he continued to work at his second job at the Corinth Fire Department.

84. On May 13, 2020, Joe Kellner, former head of Meridian, and other MRH officials went to the Corinth fire station and provided the Fire Chief a list of things that Mr. Robinson is not allowed to do.  For example, Mr. Robinson was told that he was not allowed to go into the station's closet because Northern Light has supplies there. They also advised the Fire Chief that Mr. Robinson could not participate in certain emergency calls.

85. Therefore, Defendants are continuing to take steps to retaliate against Mr. Robinson for engaging in activities protected by the WPA, MHRA, and FCA.

86. The effect of these retaliatory actions is to dissuade Mr. Robinson and other workers from engaging in protected activity and from engaging in activities protected by the WPA, MHRA, and FCA.

87. Defendants will continue to retaliate against Mr. Robinson by denying him employment opportunities because he engaged in protected activity if they are not enjoined from doing so.

## COUNT I: FCA Retaliation

88. Paragraphs 1-87 are incorporated by reference.

89. The anti-retaliation provisions of the FCA make it unlawful to discharge, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of lawful acts done by the employee in an effort to stop a violation of the FCA.

90. Defendants' conduct violates the FCA.

## COUNT II: MHRA and WPA

91. Paragraphs 1-90 are incorporated by reference.

92. Defendants' conduct violates the WPA as enforced through the MHRA.

93. Defendants' conduct violates

94. Defendants' conduct violated the MHRA's prohibitions on retaliation, interference, coercion, and intimidation set out at 5 M.R.S. §4633.

## COUNT III: TORTIOUS INTERFERENCE

95. Paragraphs 1-94 are incorporated by reference.

96. An advantageous economic relationship existed between Plaintiff and Mayo Regional Hospital.

97. Defendant EMHS was aware of this advantageous economic relationship and interfered with this relationship with the intention of interference with and ending this relationship through the use of intimidation.

98. Defendants EMHS' interference with Plaintiff's advantageous economic relationship proximately caused damages to Plaintiff.

## PRAYER FOR RELIEF

Wherefore, Plaintiff requests that the Court grant the following relief:

A. Enter Judgment in Plaintiff's favor;

B. Declare Defendants' conduct to be in violation of Plaintiff's rights under the MHRA and WPA;

C. Enjoin Defendants, their agents, successors, employees, and those acting in concert with them from continuing to violate Plaintiff's rights;

D. Order Defendants to employ Plaintiff or alternatively award front pay and benefits;

E. Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendants' discrimination;

F. Award equitable-relief for back pay, benefits and prejudgment interest;

G. Award compensatory damages in an amount to be determined at trial;

H. Award punitive damages in an amount to be determined at trial;

I. Award civil penal damages in an amount to be determined at trial;

J. Award nominal damages;

K. Award attorney's fees, including legal expenses, and costs;

L. Award prejudgment interest;

M. Permanently enjoin Defendants from engaging in any employment practices retaliating against persons who report violations of local, state and federal laws;

N. Require that Defendants mail a letter to all employees notifying them of the verdict against them and stating that Defendants will not tolerate retaliation in the future;

O. Require that Defendants post a notice at all of their work sites of the verdict and a copy of the Court's order for injunctive relief;

P. Require that Defendants train all management level employees on the protections afforded by the MHRA, WPA and the FCA;

Q. Require that Defendants place a document in Plaintiff's personnel file which explains that they unlawfully terminated Plaintiff because of retaliation; and

R. Grant to Plaintiff such other and further relief as may be just and proper.


Dated at Portland, Maine this   3rd   day of June 2021


/s/ Chad T. Hansen
Chad T. Hansen, Esq.,
Attorney for Plaintiff

EMPLOYEE RIGHTS GROUP
92 Exchange Street, 2nd floor
Portland, Maine 04101
Tel (207) 874-0905
Fax (207) 874-0343
chad@employeerightslaw.attorney